# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>APPLE IPHONE SE (2020), S/N FFMGF50SPLJM, MORE FULLY DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED AT FORT COLLINS POLICE SERVICES, 2221 SOUTH TIMBERLINE ROAD, FORT COLLINS, COLORADO 80525 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 25-sw-01647-KAS |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the <u>State and</u> District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized):*

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §2113(e) | Bank Robbery- Forced Accompaniment |

The application is based on these facts:

- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Benjamin S. Harris*
_____
*Applicant's signature*

SA Benjamin S. Harris, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _December 5, 2025_
_____
*Judge's signature*

City and state: _Denver, CO_

Kathryn A. Starnella
United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The item to be searched consists of an Apple iPhone SE (2020), serial number FFMGF50SPLJM, hereinafter "the Device". The Device is currently retained as Evidence Item 4-4 in the Property and Evidence Section of Fort Collins Police Services located at 2221 South Timberline Road, Fort Collins, Colorado.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to a violation of 18 U.S.C. § 2113(e) (the "Subject Offense") and involve Isaac MERAZ. The time period searched will be from April 27, 2025 through May 27, 2025, including:

     a.  Records and information, including images, videos, and correspondence, related to the Subject Offense;

     b.  Evidence concerning any planning or preparation to commit the Subject Offense;

     c.  Records and information concerning communications between individuals pertaining to the Subject Offense;

     d.  Any records and/or evidence revealing MERAZ' presence at Ent Federal Credit Union, located at 1107 W. Drake Rd, Fort Collins, Colorado, and travel to 1211 City Park Ave. Fort Collins, Colorado on May 27, 2023;

     e.  Evidence of MERAZ' state of mind as it relates to the Subject Offense, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

     f.  Evidence concerning efforts after the fact to conceal evidence of the Subject Offense, or to flee prosecution for the same;

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or

stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| IN THE MATTER OF THE SEARCH AN APPLE IPHONE SE (2020), S/N FFMGF50SPLJM, MORE FULLY DESCRIBED IN ATTACHMENT A, CURRENTLY LOCATED AT FORT COLLINS POLICE SERVICES, 2221 SOUTH TIMBERLINE ROAD, FORT COLLINS, COLORADO 80525 | Case No.  25-sw-01647-KAS |
|---|---|

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Benjamin S. Harris, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been since July 2014. I am currently assigned to the Denver Division FBI where I conduct investigations involving both criminal and national security matters, including business robberies and other violent crimes. I have, through training and experience, become familiar with and used all normal methods of investigation, including, but not limited to, visual surveillance, interviewing witnesses, subpoenas, search and arrest warrants, confidential human sources, consensual monitoring, pen registers, undercover operations, and court authorized wiretaps. In addition, through training and experience, I have become familiar with the manner in which electronic devices, including cellular

1

telephones, may be used in the furtherance of criminal activity, and how information from these devices may be stored, collected, and reviewed in order to obtain evidence of criminal activity.

3.      The information contained in this affidavit is based on information compiled from witness/victim interviews, fellow law enforcement officers, and by reading official police reports. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all knowledge about this matter.  Based on training and experience and the facts as set forth in this affidavit, your Affiant believes there is probable cause to believe that Isaac MERAZ did commit the crime of Bank Robbery-Forced Accompaniment against ENT Credit Union, an NCUA insured financial institution, located in the State of Colorado on or about May 27, 2025, in violation of Title 18, United States Code, Section 2113(e).  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The item to be searched consists of an Apple iPhone SE (2020), serial number FFMGF50SPLJM, hereinafter "the Device". The Device is currently retained as Evidence Item 4-4 in the Property and Evidence Section of Fort Collins Police Services located at 2221 South Timberline Road, Fort Collins, Colorado.

5.      The applied-for warrant would authorize the examination and review of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

6.    On May 27, 2025, officers of the Fort Collins Police Services (FCPS) responded to Ent Federal Credit Union (EFCU), located at 1107 W. Drake Road, Fort Collins, Colorado, in reference to a bank robbery complaint.

7.    Your Affiant is aware the EFCU had deposits insured by the National Credit Union Administration Board.

8.    Initial dispatch information indicated that at approximately 2:02pm, a white male wearing blue jeans with no belt and a visible red "Levis" tag, a black button-down shirt, black boots with patterned tread, and a grey sport coat had entered and robbed the bank at gunpoint. The report indicated that that the suspect fled southbound on foot. During the robbery, the robber was described as wearing a full rubber mask with attached fake hair.

9.    As the robber fled the bank, he dropped a portion of the money (later determined to be $2,830) and the apparent firearm used in the commission of the robbery. The firearm was later identified as a realistic-looking BB gun. The suspect also appeared to have vomited while fleeing the area. The total amount stolen from EFCU was later determined to be $48,170.

10.    FCPS officers obtained surveillance images of the suspect from inside the credit union.

11.    Responding units established a perimeter around the credit union and observed an individual, later identified as Isaac Meraz (MERAZ), sitting on a curb just outside the credit union and watching the investigation. Officers noted that MERAZ was wearing the same distinctive boots, blue jeans, and black shirt as the individual captured in the footage. MERAZ also matched the suspect's physical description, including height and build.

3

12.     MERAZ was detained by patrol officers. FCPS Detective Wilson advised MERAZ of his Miranda rights. MERAZ stated that he understood his rights and agreed to speak with Detective Wilson. When asked to explain his presence in the area, MERAZ claimed he had entered the credit union earlier that day around 1219 hours to inquire about opening a checking account for a 3D printing business he was starting. MERAZ stated that after leaving, he returned to the residence of his girlfriend, later identified as Lillie POOLER (POOLER), located at 1211 City Park Avenue, Fort Collins, Colorado, but later decided to walk back to the credit union to ask an additional question about operating agreements. MERAZ claimed it was a coincidence that he was in the area when the robbery occurred.

13.     When directly asked whether he was involved in the robbery, MERAZ raised his hands in a vague gesture and stated that his fingerprints might be on the door from when he had entered earlier as a customer. MERAZ did not explicitly deny involvement.

14.     MERAZ stated that he resides in Gilcrest, Colorado, and had driven to Fort Collins to visit POOLER. MERAZ stated he works at First National Bank of Omaha in Johnstown, Colorado, but did not wish to open an account there for fear his coworkers would access his financial information. MERAZ confirmed that after visiting the credit union, he returned to POOLER's residence at 1211 City Park Avenue. MERAZ also confirmed that his motorcycle and the business cards he had previously collected from employees were located at his POOLER's residence.

15.     Upon closer examination, FCPS officers observed that MERAZ's jeans and boots matched those seen in surveillance footage, including a distinctive heel patch and identical tread pattern. MERAZ was not wearing a belt, and his jeans featured the same red Levi's tag seen in

4

surveillance footage. Additionally, his black button-down shirt had visible yellowish residue consistent with vomit observed at the scene.

16.     Officers contacted POOLER at the address provided by MERAZ, but she declined to make any statement to law enforcement regarding her whereabouts during the robbery.

17.     FCPS officers interviewed bank employees who were present during the robbery. Two EFCU employees recognized MERAZ during the robbery based on an earlier visit that day. The witnesses described MERAZ's behavior at the earlier visit as odd and memorable -- particularly his comments regarding an "audit" at First National Bank of Omaha and his request for business cards from all employees, including the manager. During the earlier visit, MERAZ was reportedly wearing similar clothing, but with a red button-down shirt rather than the black one worn during the robbery.

18.     Employees stated that when the individual they believed to be MERAZ returned to commit the robbery, he wore the described clothing and a rubber mask. He told staff he was there to "audit" the bank—mirroring his previous statements—and demanded $100,000 and access to the vault. The robber identified a third EFCU employee by name and told her, "You are being robbed." The employee believed the robber had obtained his coworker's name from the business card he had requested earlier.

19.     The witness told police that the robber brandished a realistic-looking black handgun and pointed it directly at employees while making verbal demands to access the vault. All three employees were forced to accompany the robber to the vault under threat and coercion by the robber's use of the apparent firearm. The robber pointed the apparent firearm at an employee and walked him/her to the vault, where, out of fear, another employee gave the robber $51,000 in cash from the vault. The robber then fled.

5

20.     On May 27, 2025, FCPS officers executed a residential search warrant for 1211 City Park Avenue, Fort Collins, Colorado, where MERAZ indicated he had been just before the robbery occurred and where POOLER was contacted. During the execution of the warrant, officers located a rubber mask identical in appearance to that used during the robbery in POOLER's vehicle. Inside the residence, officers located a black duffle bag containing of $48,170 cash, as well as a grey sport coat identical in appearance to that which the subject was observed wearing during the robbery. Adjacent to the duffle bag, officers also located a black Apple iPhone. An FCPS officer dialed 970-515-9827, a telephone number known to be used by MERAZ, and the black iPhone immediately rang and displayed an incoming call notification, indicating the black iPhone was likely used by MERAZ. Officers collected the iPhone and entered it into evidence as FCPS Evidence Item 4-4.

21.     On May 27, 2025, FCPS officers seized a cellular telephone belonging to POOLER while speaking with POOLER at FCPS headquarters.

22.     On May 27, 2025, FCPS arrested MERAZ based on Colorado state charges and booked him into Larimer County Jail.

23.     On May 28, 2025, using GrayKey digital forensic examination software, FCPS officers placed the Device into Evidence Preservation Mode to preserve and protect the data on the Device. A report generated by this action listed various attributes associated with the Device, including the following:

a.  Serial Number:  FFMGF50SPLJM

b.  Phone Number:  970-515-9827

c.  Owner Name:  Isaac Meraz

d. Accounts: isaac.meraz2@icloud.com, imeraz094@icloud.com, isaac.meraz1@icloud.com

24. On May 30, 2025, pursuant to a complaint and an arrest warrant issued on May 28, 2025 by U.S. Magistrate Judge Cyrus Y. Chung, of the District of Colorado, FBI agents took MERAZ into federal custody in Denver, Colorado.

25. On June 10, 2025, POOLER and MERAZ were indicted by a grand jury of Bank Robbery and Aiding and Abetting the Same in violation of 18 USC §§ 2113(a) and 2.

26. On June 13, 2025, pursuant to an arrest warrant issued on June 10, 2025 by U.S. District Court Clerk Jeffrey P. Colwell, of the District of Colorado, FBI agents took POOLER into federal custody in Denver, Colorado.

27. The Device is currently in the lawful possession of the FCPS Evidence and Property Section, located at 2221 South Timberline Road, Fort Collins, Colorado. As stated above, it came into FCPS' possession when it was seized from POOLER's residence during the execution of a search warrant at the residence on May 27, 2025. From my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of FCPS.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28. Based on my training and experience, I know that a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone

7

number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.

29.     Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts.

30.     Cellular telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile

computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet. Some cellular telephones also contain digital cameras and software related to the taking of digital photographs. Smartphones thus may contain in one device the functions of the following devices:

a.  GPS Navigation devices:  A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

b.  Personal Digital Assistants:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media

9

for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

c.  Tablets:  A tablet is a mobile computer — typically larger than a phone yet smaller than a notebook — that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

d.  Solid State Drives:  A solid-state drive ("SSD"), also known as a solid-state disk, is a data storage device that uses integrated circuit assemblies as memory to permanently store data instead of using rotating platters.

e.  Portable Media Players:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or

10

miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

f. Digital Cameras:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable digital storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media includes various types of flash memory cards and miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos such as texts, word processing documents, or web pages. If the camera is equipped with GPS technology, that information may be recorded as metadata associated with the photographs and videos taken with that camera as well as other information such as the make and model of the camera and the date and time the image was created. Some cameras and removable storage media are now equipped with wireless capabilities, which allow for images and files to be uploaded from the camera or digital storage media directly to the Internet or to other digital storage devices or computers using a wired or wireless connection.

31.     Based on my training and experience, I use the following technical terms to convey the following meanings:

11

a. IP Address:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b. Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

32.    "Computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and can include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

33.    Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time. Similarly, things that have

been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

34. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

35. There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic

13

evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

36.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Devices that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of the use, who used the Devices, and when the Devices were used. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

14

c.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit the Subject Offense may contain: location data, digital media (such as photos and

15

videos), and research on how to carry out their intended plan, either through internet research or communication with other like-minded individuals.

g.   I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

h.   The size of the electronic storage media (commonly referred to as a hard drive) used in smartphones has grown tremendously within the last several years. Phones containing hard drives with a capacity of 32 gigabytes are not uncommon. These drives can store thousands of images and videos at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

37.   *Need to review evidence over time and to maintain entirety of evidence*. I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis. I have learned through practical experience that various pieces of evidence retrieved

from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.

38.    In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachment B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at

17

one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

39.     *Nature of examination*.  Based on the foregoing, and consistent with Rule41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying, and reviewing the contents of the Devices consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Devices or information from copies of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

40.     *Manner of execution*.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## ATTORNEY-CLIENT PRIVILEGED MATERIALS

41.     If the government becomes aware of a reasonable possibility that seized materials may include attorney-client privileged information, the government will implement filter protocols to safeguard attorney-client privileged materials and segregate those materials from review by any member of the investigative team.

18

## **CONCLUSION**

42.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

*s/Benjamin S. Harris*
Benjamin S. Harris
Special Agent
FBI

SUBSCRIBED and SWORN before me this ___5th___ day of December 2025

_____
KATHRYN A. SCARNELLA
UNITED STATES MAGISTRATE JUDGE

**Application for search warrant was reviewed and is submitted by Brian Dunn, Assistant United States Attorney.**